# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-1503 & 12-1504

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN E. WALSH and CHARLES MARTIN,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cr-00005—**Virginia M. Kendall**, *Judge.*

ARGUED APRIL 22, 2013—DECIDED JULY 23, 2013

Before WOOD, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* John E. Walsh and Charles Martin organized One World Capital Group, LLC, and devised a scheme to defraud its customers. They were caught and charged with various federal offenses. Both defendants pleaded guilty to several counts. Walsh pleaded guilty to wire fraud, tax evasion, and making false statements in a report to the Commodities Futures and Trading Commission. Martin pleaded guilty to wire

fraud, tax evasion, and a Commodities Exchange Act violation. The district court sentenced Walsh and Martin to terms of imprisonment of 150 and 204 months, respectively, and ordered each of them to pay $16,976,554 in restitution. They appeal their sentences. Walsh challenges the district court's finding as to the amount of the loss and restitution, and both defendants challenge the application of a sentencing enhancement based upon a finding that each was an officer or director of a futures commission merchant. Finding no error, we affirm.

## I. Background

Walsh and Martin were principals of One World, a futures and foreign currency trading company, formed in 2005.[1] One World acted as a "futures commission merchant" and as a "forex dealer member." A company acting as a futures commission merchant must register with the Commodities Futures and Trading Commission (CFTC),[2] 7 U.S.C. § 6d(a); and once registered, must meet registration requirements, which include maintaining net capital to cover trades and filing monthly financial reports reflecting the company's financial condition. *See*

---

[1] Foreign currency transactions (forex transactions) involve the sale or purchase of one national currency relative to another. Traders earn profits based upon the change in value of the two currencies over a period of time.

[2] The CFTC is an independent regulatory agency that administers and enforces the Commodity Exchange Act and corresponding regulations.

17 C.F.R. § 1.17(a)(1); *id.* § 1.10(b)(1)(i) ("each person registered as a futures commission merchant must file a Form 1-FR-FCM as of the close of business each month"). Walsh, as owner, president, and primary manager, registered One World with the CFTC and with the National Futures Association (NFA).[3] Martin was banned from serving as a principal or "associated person" of an NFA member because of prior convictions, so the defendants concealed his position with One World from the CFTC and the NFA. One World operated until December 2007, when the CFTC obtained a temporary restraining order and shut down its operations.

As a forex dealer member, One World accepted retail customer funds for the purpose of acting as a counterparty, or offering to act as counterparty, to over-the-counter forex transactions. Customers traded forex with One World via "Metatrader 4," an internet trading platform, which maintained records of their trading activity and calculated the changing value of their forex trading accounts. At a customer's request, the trading platform generated and distributed an electronic account statement reflecting the equity value of the customer's forex trading account. As a prerequisite to accepting trades, One World required customers to secure their forex positions by depositing funds, known

---

[3] The NFA is a registered futures association that serves as an independent, self-regulatory organization for the futures industry that develops rules, programs, and services to safeguard the futures market.

as "margin funds," with One World, but those funds remained the customers' property. Customer margin funds were to be credited or debited according to changes in the value of the customer's forex trading positions. The defendants represented to customers and prospective customers that margin funds were maintained in a separate One World customer account.

Shortly after One World's formation, Walsh and Martin began to transfer customer margin funds from One World to their own personal accounts. They used the misappropriated funds to purchase goods and services for themselves and to finance personal business ventures. They misappropriated $10,019,619 in One World customer funds. Walsh deposited those funds into his personal checking account and transferred $3,771,100 to Martin's personal checking account. Martin transferred an additional $2,887,776 directly from One World to his personal bank account. Walsh and Martin also charged $4.6 million to One World's corporate credit cards for various personal expenses. Their misappropriation of customer margin funds rendered One World insolvent by April 2006.

Walsh and Martin concealed One World's insolvency and their criminal conduct by misleading customers about the company's ability to meet its obligations. They allowed existing customers to continue to obtain account statements that falsely stated their available margin funds, and they solicited new customers by making false and misleading statements. They also used a Ponzi-like scheme, paying existing customers' redemp-

tion requests with new customers' margin deposits. And Walsh directed One World to submit to the CFTC false and misleading monthly financial reports that understated the company's liabilities and overstated its assets.

The NFA initiated a formal action against One World and Walsh in 2007, precipitating an increase in customer redemption requests. By the fall of that year, One World had insufficient funds to honor redemption requests because of the defendants' conduct. Walsh falsely assured, and caused others to falsely assure, customers that One World would honor their redemption requests; he claimed that they just needed more time. As of November 5, 2007, about one month before the CFTC shut down One World, Metatrader's records showed that One World had $17,654,486 in unpaid customer liabilities and only $677,932 in assets.

Walsh pleaded guilty to wire fraud, tax evasion, and making false statements in a report to the CFTC. In his written plea agreement, Walsh reserved the right to contest the loss amount but agreed that his offense level should be increased by 4 levels under U.S.S.G. § 2B1.1(b)(17)(B) (2010)[4] because the offense involved a violation of commodities law and, at the time of the

---

[4] The 2010 version of the Sentencing Guidelines was in effect when the defendants entered into their plea agreements and pleaded guilty, but the 2011 version was in effect at their sentencing hearings. The disputed offense-level increase was in subsection (b)(17)(B)(i) of § 2B1.1 in the 2010 version, but subsection (b)(18)(B)(i) in the 2011 version. We will refer to the 2011 version, U.S.S.G. § 2B1.1(b)(18)(B)(i).

offense, he was an officer of a futures commission merchant. The presentence report (PSR) determined that Walsh's total offense level was 38, incorporating a 20-level increase based on a loss amount of more than $7 million but less than $20 million, and a 3-level reduction for acceptance of responsibility. Walsh had 4 criminal history points, placing him in criminal history category III. Given a total offense level of 38 and a criminal history category III, his guidelines range was 292 to 365 months. Because the statutorily authorized maximum sentence was less than the upper limit of the guideline range, the guideline range was restricted to 292 to 360 months. *See* U.S.S.G. § 5G1.1.

At sentencing, Walsh objected to the PSR's conclusion as to the loss amount. He argued that the loss was less than $7 million, which would have yielded an 18-level increase in offense level. The government maintained that the loss was approximately $17,654,486, based on the Metatrader records, reflecting unpaid One World customer liabilities in that amount. The district court agreed with the government, finding that the loss amount was a "conservative $17,654,000." The court reduced that amount to $16,976,554, to account for $677,932 in One World assets. Accordingly, the court determined that Walsh's guideline range was 292 to 360 months and imposed a term of 150 months' imprisonment, a term of supervised release, 200 hours of community service, a mandatory special assessment, and ordered restitution of $16,976,554. The court addressed the sentencing factors, *see* 18 U.S.C. § 3553(a), and ex-

plained why it imposed a below-range sentence. In discussing the seriousness of the offense, the court said it was an "extensive fraud scheme" involving "an intended loss of 17 million or more." Walsh Sent. Tr. 87.

Martin pleaded guilty to wire fraud, tax evasion, and stealing money provided to a futures commission merchant. In the written plea agreement, he agreed that the loss exceeded $7 million but was less than $20 million, thus increasing his offense level by 20, but he reserved the right to contest the application of the 4-level increase under U.S.S.G. § 2B1.1(b)(18)(B)(i). The PSR determined that Martin should receive a 3-level reduction for acceptance of responsibility; thus, it determined that his total offense level was 38. The PSR placed Martin in criminal history category I. A total offense level of 38 and a criminal history category I yielded a guideline range of 235 to 293 months.

At sentencing, Martin's only objection to the PSR's guideline calculation was that U.S.S.G. § 2B1.1(b)(18)(B)(i) did not apply because he was not "personally registered" as an officer or director of One World. The district court overruled the objection and applied the enhancement. The court calculated Martin's guideline range as 235 to 293 months, considered the sentencing factors, and imposed a below-range sentence of 204 months' imprisonment, a term of supervised release, a mandatory special assessment, and ordered Martin to pay $16,976,554 in restitution.

## II.  Discussion

On appeal, Walsh contests the district court's loss determination and application of the 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K). Both defendants challenge the court's application of the 4-level enhancement under U.S.S.G. § 2B1.1(b)(18)(B)(i), arguing that they were not officers or directors of a futures commission merchant. Walsh also moves for leave to file a supplemental brief in order to challenge the court's restitution order.

### A.  Loss Calculation

Walsh argues that the district court clearly erred in finding that the loss caused by his offense was more than $7 million but less than $20 million, and as a result, improperly calculated his guidelines range. He complains that the government failed to prove intentional loss of $17 million; he claims specifically that it failed to prove his subjective intent. He also argues that evidence of actual loss was unreliable, that the district court shifted the burden of proof to him to prove errors in the government's loss calculation, and that customer margin balances were an inappropriate measure of loss from the offense.

"We review the district court's interpretation and application of the guidelines de novo and its findings of fact for clear error." *United States v. Natour*, 700 F.3d 962, 975 (7th Cir. 2012) (quotation and citation omitted). For cases like this involving fraud, the defendant's base

offense level may be increased based on the amount of the loss. U.S.S.G. § 2B1.1(b). The guideline provides that "[i]f the loss [was] [m]ore than $7,000,000" but less than $20,000,000 "add 20" to the offense level. U.S.S.G. § 2B1.1(b)(1)(K)-(L). The district court's loss calculation "need only be 'a reasonable estimate of the loss.'" *Natour*, 700 F.3d at 976 (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)). We generally review the loss calculation for clear error. *Natour*, 700 F.3d at 976. New arguments or theories not raised in the district court, however, are forfeited and reviewed for plain error. *United States v. Westerfield*, 714 F.3d 480, 488 (7th Cir. 2013). When a defendant challenges a district court's loss calculation, he must "demonstrate that it is inaccurate" and "outside the realm of permissible computations." *Natour*, 700 F.3d at 978 (quotation and citation omitted).

"A defendant who stipulates to facts as part of a written plea agreement also waives challenges to the district court's reliance on those facts." *United States v. Scott*, 657 F.3d 639, 640 (7th Cir. 2011) (per curiam). As the government asserts, Walsh admitted both in his written plea agreement and in his plea colloquy that he misappropriated "over $10 million in One World customer funds" and "deposited approximately $10,019,619 in One World funds in his personal Citibank account." Walsh Plea Agreement 5; see also Walsh Change of Plea Tr. 28-29 & 39 (agreeing that he and Martin engaged in a scheme to defraud One World customers and that, through the scheme, they misappropriated over $10 million in customer funds). Walsh's challenge to the loss amount runs head-on into these admissions.

Walsh's argument that the district court's loss calcula-
tion was based on "intended loss" rather than "actual
loss" is raised for the first time on appeal. Thus, our
review is for plain error only. *E.g.*, *Westerfield*, 714 F.3d
at 488. This argument has no support in the record;
thus, there is no error, plain or otherwise. The guideline
application notes state that "loss is the greater of the
actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.(3)(A).
The record establishes that the district court's loss cal-
culation was based on the actual, not intended, loss.
*See United States v. Dokich*, 614 F.3d 314, 319 (7th Cir.
2010). The PSR based the 20-level increase under
2B1.1(b)(1)(K) on the defendants' "misapprorpiat[ion of]
over $10 million in One World customer funds." Walsh
PSR 10; *see also id.* at 7 (referring to the "unpaid aggregate
equity balance that exceeded $17,000,000"). Likewise,
the government's loss calculation was based on
"$17,654,486 in unpaid customer liabilities," which was
derived from an analysis of the Metatrader trading plat-
form records as of November 5, 2007. *See, e.g.*, Gov't
Sent. Memo 3; Walsh Sent. Tr. 43 (government counsel ex-
plaining that "[o]ur loss calculation" is based on "equity
balances"); *id.* at 46 (again referring to "an equity balance"
of $17,654,486).

Furthermore, at sentencing, in disputing the loss
amount, Walsh's counsel acknowledged that the gov-
ernment's loss calculation was based on claimed "unpaid
customer liabilities," which came from an analysis of
the trading platform records. Walsh Sent. Tr. 10. As
Walsh himself points out, "[t]he only time the word 'in-
tended' was even mentioned at his sentencing hearing

was when the judge said the 'scheme had an intended loss of over $17 million.'" Appellants' Br. 19. Our review of the entire record reveals that the district judge simply misspoke in referring to an "intended loss"—a single reference made not in determining the loss amount but rather when discussing the § 3553 factors. The record points us to one conclusion: the district court's loss determination was based on actual loss.[5]

And contrary to Walsh's argument, the record does establish his intent to defraud One World customers. In addition to admitting to misappropriating $10 million in customer funds, Walsh admitted in his plea agreement that he and Martin "transferred One World customer margin funds to their personal accounts with the express intent to steal, embezzle and convert those funds." Walsh Plea Agreement 6. He also admitted that they "used the customer funds misappropriated to purchase goods and services for themselves, and to finance other personal business ventures." *Id.* And Walsh's admitted actions manifest his intent: He admitted to "misleading existing and prospective One World customers, lying to regulators about One World's financial condition, and . . . making Ponzi-type payments to One World's pre-existing customers." *Id.* at 7. More particularly, Walsh admitted to sending emails to customers assuring

---

[5] The court's reliance on actual loss seems to have benefited Walsh. The court stated that it thought the intended loss was much greater than actual loss. *See* Martin Sent. Tr. 34-35 ("This is a very massive fraud scheme, and the amount of intended loss is astronomical. The amount of actual loss is really solid.").

them that One World would honor redemption requests when he knew that it lacked sufficient funds to do so. *Id.* at 11. Furthermore, he admitted that by April 2006 and continuing until October 2007, at his direction, One World "submitted false and misleading" financial reports to the CFTC. *Id.* at 9.

Walsh contends that the evidence of actual loss was unreliable and that the district court improperly shifted the burden of proof to him. He challenges the court's reliance on Joy McCormack's analysis of data from Metatrader and argues that Daniel Colgan's testimony showed flaws in her analysis, including reliance on unknown user accounts and losing trades. However, the government's loss analysis by McCormack, senior investigator at the CFTC, excluded unknown user accounts. S*ee* R.176, Gov't Sent. Mem. 4-5 ("In an abundance of caution, the government subtracted test and [trading group accounts] from its loss calculation spreadsheet."). And Walsh had no evidence at sentencing to support his claim regarding losing trades. *See* Walsh Sent. Tr. 40. Moreover, the McCormack loss analysis was "an incredibly conservative estimate," *id.* at 46, because One World was a fraud as a whole; thus, the loss amount could have been much higher. As well, the loss analysis only accounted for customers who were trading in forex on the Metatrader platform; it did not account for forex customers who were not trading on that platform or for customers who traded futures. Thus, the government's loss analysis represented the loss to only a subset of One World customers.

Beyond the specific claims noted above, Walsh offers only general criticisms of McCormack's analysis rather than detailed factual objections. His unsupported, general objections are insufficient to show that the evidence of loss was unreliable or that the court shifted the burden of proving (or disproving) the loss amount to him. *See United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) ("Although the burden is on the government to determine the amount of loss, once the government has met its burden of proving loss, the defendant's wholly unsubstantiated statements are not enough to counter or even question the court's acceptance of the government's proof of loss.").

According to Walsh, however, his concessions establish a loss amount much lower than $17 million. He focuses exclusively on his admission to a $1.5 million wire transfer identified in his plea agreement as one example where One World customers who, based on the materially false and misleading representations of Walsh and Martin, continued to provide margin funds for future forex trading. Walsh Plea Agreement 8. In doing so, Walsh completely ignores other admissions in his plea agreement, including that he "misappropriated over $10 million in One World customer funds" by depositing "funds in his personal Citibank account." *Id.* at 5. We, like the district court, take all of Walsh's admissions into account.

Next, Walsh maintains that margin balances were an inappropriate measure of loss from the offense, asserting that customers who had margin balances in November

2007 were not necessarily victims of fraud. He claims that their losses were not directly caused by the defendants and suggests that their losses may have been due to the NFA's formal action against One World, which precipitated a "run-on-the-bank"; "premature withdrawals by Martin and Walsh"; and CFTC's shut down of One World in December 2007. Because Walsh did not raise these arguments in the district court, we review for plain error. *See Westerfield*, 714 F.3d at 488.

Given the broad range of the loss amount that yields the 20-level increase in offense level, "there's . . . no need to determine with precision where within that span the loss falls." *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008). The loss determination "does not require more than an estimate." *Id.* Thus, the district court need not identify specific victims who were refused margin redemption requests for purposes of calculating the loss. *Cf. id.* (contrasting loss determination for purposes of § 2B1.1 which may be based on an estimate with restitution which "requires an exact figure" and must be determined "one customer at a time").

Furthermore, it was the defendants' own criminal conduct that precipitated the NFA's formal action against One World, the "run-on-the-bank," and the CFTC's shut down. Besides, Walsh offers no evidence to show that the appointment of a receiver would have made a difference in the loss to One World customers, specifically, that the loss would have fallen below the $7 million mark required for the 20-level enhancement. Nor has Walsh shown that the defendants could have repaid any funds

allegedly "prematurely" withdrawn. *See, e.g.*, *United States v. Mount*, 966 F.2d 262, 266 (7th Cir. 1992) ("An embezzler who abstracts $10,000 to invest in the stock market causes a 'loss' of $10,000 even if he plans to re-pay."). We add that Walsh's characterization of the de-fendants' misappropriation of funds as "premature withdrawals" contradicts his admission that they "trans-ferred One World customer margin funds to their personal accounts with the express intent to steal, embez-zle and convert those funds." Walsh Plea Agreement 6.

Moreover, as an alternative basis for its loss calculation, the district court used the gain to the defendants from their offenses. The guideline provides that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. n.3(B). The district court found that the gain resulting from the defendants' offenses was $10 million. Walsh Sent. Tr. 51 ("We certainly have a hard-figure loss of $10 million going out to the two defendants . . . ."). This finding is not clearly erroneous. As noted, Walsh admitted to "misappropriat[ing] over $10 million in One World customer funds," "deposit[ing] approxi-mately $10,019,619 in One World funds in his personal Citibank account," and "us[ing] the customer funds misappropriated to purchase goods and services for [Walsh and Martin], and to finance other personal business ventures." Thus, if the loss could not be rea-sonably determined, the district court could rely on the gain to the defendants as an alternative basis on which to find the amount of loss. The defendants' gain

of $10 million easily fits within the broad range of $7 to $20 million in U.S.S.G. § 2B1.1(b) for the 20-level enhancement.

We conclude that the district court properly relied on Walsh's admissions and the evidence presented at sentencing to find a loss amount of approximately $17 million and that its calculation was a reasonable estimate of the loss. Therefore, the court did not err in determining the loss amount—an amount well within the range in U.S.S.G. § 2B1.1(b)(1)(K)—and properly increased Walsh's offense level by 20.

Walsh sought leave to file a supplemental brief in order to challenge the court's restitution order. His motion for leave to file a supplemental brief is GRANTED. However, his challenge to the district court's restitution order comes far too late. He did not object to the restitution order at sentencing, thus at the least forfeiting any challenge to that order. And after sentencing, the government moved to present the court with victim restitution information, advising that it had underestimated the total losses attributable to the defendants' conduct. Neither defendant objected to the restitution amount, and the district court issued an Amended Judgment. If Walsh's challenge to the restitution order was not waived but only forfeited, we would review the restitution order for plain error. Walsh's challenge to the restitution order is succinctly stated as this: "The restitution order . . . was based on the same outstanding margin balances that the government submitted to prove loss." Given our conclusion that the district court

did not err in finding the loss amount, we find no plain error in the restitution order.

### B.  Whether One World was a Futures Commission Merchant

Martin argues that the district court erred in finding that he was an officer or director of a futures commission merchant and, on the basis of this finding, increasing his offense level by 4 under U.S.S.G. § 2B1.1(b)(18)(B)(i). He maintains that One World was not a futures commission merchant; therefore, he could not be an officer or director of a futures commission merchant. Walsh adopts Martin's argument. Because Walsh did not object to the court's application of the enhancement, as he concedes, we review for plain error. *See Westerfield*, 714 F.3d at 488.

The guideline calls for a 4-level increase in offense level "[i]f the offense involved—a violation of commodities law and, at the time of the offense, the defendant was (i) an officer or director of a futures commission merchant." U.S.S.G. § 2B1.1(b)(18)(B)(i). The defendants do not dispute that the offenses involved a violation of commodities law or that they were officers or directors of One World. We reject their contention that One World was not a futures commission merchant.

"A defendant who stipulates to facts as part of a written plea agreement also waives challenges to the district court's reliance on those facts." *Scott*, 657 F.3d at 640. Walsh and Martin admitted in their written plea agreements that One World "was a futures . . . trading

company," Plea Agreements 3, that "One World acted as a futures commission merchant ("FCM") registered with the CFTC," *id.* that, "[a]s a FCM, One World was required to file a monthly financial report with the CFTC," *id.* at 9, and that the "CFTC generally used these financial reports to insure . . . that a FCM like One World was compliant with its regulatory . . . requirements," *id.* Walsh pleaded guilty to filing a false report required of futures commission merchants. He admitted in his written plea agreement that his offense level should be increased by 4 under U.S.S.G. § 2B1.1(b)(18)(B)(i) because "the offenses of conviction involved a violation of commodities law and, at the time of the offense, the defendant was an officer of a futures commission merchant." Walsh Plea Agreement 17. At his plea hearing, Walsh expressed his understanding that the 4-level increase applied "because . . . at the time of the offense[, he] was an officer of a futures commission merchant." Walsh Plea Hr'g 12. In addition, he did not merely fail to object to application of § 2B1.1(b)(18)(B)(i); in his written plea agreement, he agreed that it should be applied and he stipulated to the facts supporting its application. Thus, Walsh expressly waived any challenge to application of the 4-level enhancement.

Likewise, Martin waived any challenge to the district court's reliance on the fact that One World was a futures commission merchant. Not only did Martin not object at his sentencing to a finding that One World was a futures commission merchant, he admitted that fact in his written plea agreement. Thus, the defendants waived challenges to the district court's reliance on the

admitted fact that One World was a futures commission merchant. *See Scott*, 657 F.3d at 640.

But even if the defendants merely forfeited the argument that One World was not a futures commission merchant, we find no error. The guideline points to the Commodity Exchange Act for the definition of "futures commission merchant," *see* U.S.S.G. § 2B1.1, app. n.14(A). Citing the definition in effect at the time of the offense, *see* 7 U.S.C. § 1a(20) (2007) (defining a "futures commission merchant" to include a company that "is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery"), the defendants argue that One World had to be involved in the purchase or sale of any commodity for future delivery. They then maintain that under *CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004), One World was not a "futures commission merchant." *Zelener* held that rollovers of foreign currency sales were not contracts of sale of a commodity for future delivery but were instead spot sales. *Id.* at 869. *Zelener* is inapposite as it was strictly a forex case. Here, the defendants acknowledge that Walsh "had some carryover futures clients that followed him to One World," Appellants' Br. 34 n.9, and that "One World had some futures customers," *id.* at 36.

Although the defendants argue that this case was "solely about the forex side of the business," *id.* at 34 n.9, their claim is not supported by the record. Count Four of the information charged Walsh with making false and misleading statements to the CFTC in a required filing (Form 1-FR-FCM) filed on behalf of One World. Specifi-

cally, the count charges that he falsely reported One World's assets and liabilities, knowing that his report was false in violation of 7 U.S.C. § 13(a)(3). Thus, Walsh pleaded guilty to making false statements to the CFTC in a report required of registered futures commission merchants. *See* Walsh PSR 7 ("As a FCM, One World was required to file a monthly financial report with the CFTC, known as a Form 1-FR-FCM . . . ."). And Martin benefited from the fraudulent filings with the CFTC. The false statements in the reports were an important part of the scheme to defraud, concealed the fraud from the CFTC, and allowed the defendants to solicit customers and continue their misappropriation of customer margin funds. In addition, the defendants pleaded guilty to the charged scheme, which included the preparation and submission of monthly financial reports with the CFTC—Forms 1-FR-FCM. And application of the enhancement furthers the purpose of the 4-level increase, which is to impose higher sentences on defendants who hold themselves out as officers or directors of a "futures commission merchant" regulated by the CFTC in order to further their fraud and attract potential victims.

The district court did not err in finding that One World was a "futures commission merchant." As noted, the defendants acknowledge that Walsh "had some carryover futures clients that followed him to One World" and that "One World had some futures customers." Their PSRs provide factual support for the finding that One World provided services for both futures and forex trading to its customers. *See* Walsh PSR 6 (describing One World as a "futures and [forex] trading

company"); Martin PSR 6 (same). The presence of these facts supporting the guideline's application distinguishes this case from *United States v. Jaimes-Jaimes*, 406 F.3d 845, 846-47 (7th Cir. 2005). There, we found plain error in the application of a sentence enhancement based on an erroneous view of a fact—that the defendant had been convicted of a crime of violence. *Id.* at 849-50. In addition, the government and we had focused on the lack of a specific objection to the presentence report rather than any admission in the plea agreement. *Id.* at 847-48. The defendants do not contend that a company which provides futures trading services fails to qualify as a "futures commission merchant." The district court did not err in applying the 4-level increase to the defendants as officers or directors of a futures commission merchant.

## IIII.  Conclusion

For the foregoing reasons, we AFFIRM the defendants' sentences.